IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| VIVINT, INC., a Utah corporation,<br><br>Plaintiff,<br><br>vs.<br><br>NORTHSTAR ALARM SERVICES, LLC, a Utah limited liability company,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br>Case No. 2:16-cv-00106-JNP-EFJ<br><br>Judge Jill N. Parrish |

Before the court is Plaintiff Vivint, Inc.'s ("Vivint") Motion for Partial Summary Judgment on its First Cause of Action for Declaratory Judgment (the "Motion"). [Dkt. No. 70]. Specifically, Vivint seeks a declaration that Defendant NorthStar Alarm Services, LLC ("NorthStar") is the successor in interest to third-party Vision Security, LLC ("Vision") and is therefore bound by the terms of a settlement agreement between Vivint and Vision. The court held oral argument on the Motion on February 23, 3017. Because genuine disputes of material fact exist, the court denies the Motion.

**FACTUAL BACKGROUND**

Vivint and NorthStar are both in the business of marketing, selling, and installing electronic home automation and security systems. Companies in the home alarm and automation industry market their products and services in a variety of ways, including door-to-door direct sales. As two of the more established companies in the industry, Vivint and NorthStar have been competing against each other since 2001.

In 2010, Vivint sued Vision, another competitor in the home security industry, alleging, inter alia, deceptive sales practices towards Vivint's customers. In December 2014, Vivint and Vision entered into a settlement agreement (the "Settlement Agreement") to resolve that litigation. The Settlement Agreement includes a provision that requires Vivint and Vision to follow an arbitration procedure to settle future disputes relating to allegations of deceptive sales practices. The Settlement Agreement also states that its terms are binding on Vivint and Vision's successors and assigns.

Beginning in early 2014, Vision and NorthStar discussed a possible transaction between the two. Those discussions were consummated by the execution of an Asset Purchase Agreement, dated January 16, 2015 (the "APA"), whereby Vision sold approximately 8,000 customer accounts and related assets to NorthStar, and NorthStar hired certain Vision employees and representatives.

Vivint now seeks a declaratory ruling that NorthStar is bound to the terms of the Settlement Agreement as the successor in interest to Vision. Vivint argues that the APA transaction constitutes a "de facto merger" of Vision and NorthStar and that NorthStar is therefore bound to the Settlement Agreement under Utah's successor liability doctrine. NorthStar responds by arguing that it never agreed to be bound by the Settlement Agreement, that the APA transaction was an asset purchase and not a "de facto merger," and that the successor liability doctrine does not apply.

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the court must examine all of

the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.,* 54 F.3d 624, 628 (10th Cir.1995) (citation omitted). This requires that all reasonable inferences be drawn in favor of the nonmoving party. *Sports Unltd., Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (citation omitted). A dispute of fact is genuine only if "a reasonable [trier of fact] could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014). "At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). "Nonetheless, '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper." *Id.* (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

## ANALYSIS

**I.      Successor Liability**

Utah case law regarding successor liability in this context is sparse. The few cases that discuss and analyze claims of successor liability do so in the context of products liability cases. *See, e.g.*, *Tabor v. Metal Ware Corp.*, 168 P.3d 814, 816–17 (Utah 2007). These cases indicate that Utah adheres to the traditional corporate law view of successor nonliability, subject to four exceptions, as outlined in section 12 of the Restatement (Third) of Torts. *Id.* (stating the general rule of successor nonliability and its four exceptions and citing Restatement (Third) of Torts: Products Liability). Utah courts have described that traditional view as follows:

> [W]here one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and

3

purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts.

*Macris & Assocs., Inc. v. Neways, Inc.*, 986 P.2d 748, 752 (Utah Ct. App. 1999) (quoting *Florom v. Elliott*, 867 F.2d 570, 575 n.2 (10th Cir. 1989) (quotation marks omitted)), *aff'd*, 16 P.3d 1214 (Utah 2000). Vivint argues that the second of the four enumerated exceptions applies in this case.

The second of the four exceptions described in *Macris* is commonly referred to as the de facto merger exception. Courts applying the de facto merger exception look beyond the form of an asset sale to determine whether there has been, in substance, a merger or consolidation. *See, e.g.*, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 965 N.Y.S.2d 284, 297 (Sup. Ct. 2013) (citations omitted). Whether a de facto merger has occurred generally depends on the presence of the following factors:

> (1) there is a continuation of the enterprise of the seller in terms of continuity of management, personnel, physical location, assets, and operations;
> (2) there is a continuity of shareholders;
> (3) the seller ceases operations, liquidates, and dissolves as soon as legally and practically possible; and
> (4) the purchasing corporation assumes the obligations of the seller necessary for uninterrupted continuation of business operations.

*Ekotek Site PRP Comm. v. Self*, 948 F. Supp. 994, 1002 (D. Utah 1996) (citation omitted) (analyzing successor liability for CERCLA claims). *See also Decius v. Action Collection Serv., Inc.*, 105 P.3d 956, 959 (Utah Ct. App. 2004) ("The second exception, the 'de facto merger,' considers whether the business operations and management continued and requires that the buyer paid for the asset purchase with its own stock." (citation omitted)). And, as other courts have recognized, "[i]t bears noting that the de facto merger doctrine is rooted in equity, and has the purpose of avoiding patent injustice which might befall a party simply because a merger has been called something else." *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 980 F. Supp. 2d

400, 410 (E.D.N.Y. 2013) (citations and quotation marks omitted). *See also Gray v. Loyola Univ. of Chi.*, 652 N.E.2d 1306, 1310 (Ill. App. Ct. 1995) ("The de facto merger doctrine applies where statutory merger formalities are not followed, but where, for reasons of equity, the acquiring corporation is treated as if they had been followed."); *Lehman Bros. Holdings v. Gateway Funding Diversified Mortg. Servs., L.P.*, 989 F. Supp. 2d 411, 431 (E.D. Pa. 2013), aff'd, 785 F.3d 96 (3d Cir. 2015) ("The *de facto* merger determination is a matter of equity, designed to look beyond the contract."); *DeJesus v. Bertsch, Inc.*, 898 F. Supp. 2d 353, 362 (D. Mass. 2012), *aff'd sub nom. DeJesus v. Park Corp.*, 530 F. App'x 3 (1st Cir. 2013) ("The successor liability doctrine is an equitable doctrine, and the Court considers whether the shareholders used a disguised mechanism to transfer the legal ownership of the corporation but ultimately retain the same effective control.").

  NorthStar argues that, under Utah law, it cannot be liable as Vision's successor in interest unless it purchased *all* of Vision's assets. In support of this argument, NorthStar relies on the Utah Court of Appeals' decision in *Decius*, which articulates the successor liability rule as follows: "Where one company sells or otherwise transfers *all* its assets to another company, the latter is not responsible for the debts and liabilities of the transferor," subject to the four well-settled exceptions already noted above. 105 P.3d at 958–59 (emphasis added) (brackets, quotation marks, and citations omitted). However, a subsequent decision by the Utah Supreme Court, which articulated the successor liability rule in the context of products liability, omitted the requirement that *all* assets be sold or transferred. *Tabor*, 168 P.3d at 816–17. And the Utah Supreme Court has only required the acquisition of "all or substantially all the assets" in order for successor liability to attach in the employment benefits context. *True-Flo Mech. Sys., Inc. v. Bd. of Review of the Indus. Comm'n of Utah*, 743 P.2d 1161, 1163 (Utah 1987). Thus, under

Utah law, the sale or transfer of *all* assets is not an absolute prerequisite to a finding of successor liability.[1] However, the Restatement (Third) of Torts does point out that the de facto merger exception "most frequently ha[s] significance when the predecessor has transferred all of its assets to the successor and, at least formally, has ceased to exist." Restatement (Third) of Torts: Prod. Liab. § 12 cmt. h. (1998).

II.     **NorthStar's Evidentiary Objection**

NorthStar objects to the court's consideration of the materials attached to Vivint's Motion as Exhibits 7–10. NorthStar objects to those exhibits on grounds that they are inadmissible parol evidence. The parol evidence rule "operates in the absence of fraud to exclude contemporaneous conversations, statements, or representations offered for the purpose of varying or adding to the terms of an integrated contract." *MediaNews Grp., Inc. v. McCarthey*, 494 F.3d 1254, 1262 (10th Cir. 2007) (applying Utah law) (citation, quotation marks, and emphasis omitted). But the court is not construing or interpreting the language of the APA under Utah law. Rather, the court is looking beyond the APA itself to determine whether the practical effect of the transaction was a de facto merger. *MBIA Ins. Corp.*, 965 N.Y.S.2d at 297. Accordingly, NorthStar's objection is OVERRULED.[2]

---

[1] Requiring the sale or transfer of all assets would also render meaningless one of the factors to be considered in determining the existence of a de facto merger. The first factor requires the court to consider whether "there is a continuation of the enterprise of the seller in terms of continuity of management, personnel, physical location, *assets*, and operations." *Ekotek*, 948 F. Supp. at 1002 (emphasis added). If the sale of *all* assets were a prerequisite to finding a de facto merger, there would be no reason to inquire into the continuity of the seller's enterprise in terms of its assets because they would all necessarily have transferred to the buyer.

[2] Although the court overrules NorthStar's objection pursuant to the parol evidence rule, the court notes that the relevance of Exhibits 7–10 to the de facto merger inquiry is marginal. Exhibits 7–10 may be evidence of the intent of the parties when they entered into the APA, but the parties' intent is not one of the factors to be considered in the de facto merger analysis. The court's inquiry is to look beyond what the APA said it was, or how the parties characterized the transaction, and determine the practical effect of the transaction. *See MBIA Ins. Corp.*, 965 N.Y.S.2d at 297.

### III. Application Of The De Facto Merger Factors

The court now turns to the de facto merger test and concludes that there are genuine disputes of material fact that preclude summary judgment. Based on the record before the court, a rational trier of fact could find in favor of NorthStar on the question of whether a de facto merger occurred. Accordingly, summary judgment is inappropriate and Vivint's Motion must be denied.

#### A. There is a genuine dispute of fact as to whether NorthStar continued the Vision enterprise

The first factor to consider in evaluating whether the APA resulted in a de facto merger between Vision and NorthStar is whether "there is a continuation of the enterprise of [Vision] in terms of continuity of management, personnel, physical location, assets, and operations." *Ekotek*, 948 F. Supp. at 1002.

##### 1) Continuity of management and personnel

Vision had about 70 full-time employees at the time of the APA transaction. About half of those employees accepted positions at NorthStar following the APA transaction. Additionally, Vision had approximately 250 sales representatives during the 2014 sales season, of which 30–35 (or between 12% and 14% of Vision's 2014 sales force) sold for NorthStar after the APA transaction. In total, about 67 individuals who had worked for Vision in some capacity were hired by NorthStar. Each former Vision employee or sales representative who was hired by NorthStar was required to complete new-hire paperwork and to accrue six months of employment at NorthStar before paid time off was available to them. While NorthStar recognized and assumed each employee's unused vacation time, sick time, or holiday time that the employee had accrued at Vision, Vision remained responsible for the payment of other

employee benefits, salaries, year-end bonuses, or other compensation due to its former employees.

Included among the former Vision employees who were hired by NorthStar were several former Vision senior managers or executives. These include Rob Harris, Vision's CEO and owner who became President of NorthStar, Dan Noble, Vision's Chief Financial Officer who became NorthStar's Chief Operating Officer, Sean Brown, Vision's General Counsel who became NorthStar's General Counsel, and Ryan Roche, Vision's Vice President of Sales who became Vice President of Sales at NorthStar. Despite becoming President of NorthStar, Rob Harris continued as CEO and majority owner of Vision. Other than the positions listed above, NorthStar's executive team was the same before and after the APA transaction, including Jason Christensen as CEO, Leah Young as Director of Human Resources, Kent Griffith as Chief Financial Officer, Courtney Brown as Public Relations Manager, and Matt Fletcher as Director of Information Technology. When all was said and done, the APA transaction left only two people working at Vision: CEO and owner, Rob Harris, and Danielle Paletz. Ms. Paletz continued as an employee of Vision until her employment was terminated approximately six months after the APA transaction.

        2)        Continuity of physical location

Pursuant to the APA, NorthStar acquired Vision's leases and office spaces located in Orem, Utah, and Tempe, Arizona, assuming Vision's obligations under those leases. NorthStar also acquired "all of the furniture, fixtures and equipment used by or in connection with the Business[3] that relates to the [c]ustomer [a]ccounts" that Vision sold to NorthStar. And Vision

---

[3] "Business" is defined in the APA to be Vision's "business of marketing, selling, installing, monitoring and servicing electronic security systems and related services for consumers."

also sold to NorthStar "all of the tangible and intangible properties and assets necessary for the conduct of the Acquired Business[4] as currently conducted." Despite selling the leases and office spaces in Orem and Tempe to NorthStar, Vision has continued operating out of other office space that it leases in Pleasant Grove, Utah.

        3)      Continuity of assets and operations

NorthStar purchased approximately 8,000 customer accounts from Vision, along with eleven existing contracts that Vision had with third-parties, including service agreements, equipment leases, and Vision's contract with its alarm equipment supplier. Other assets acquired by NorthStar included Vision's goodwill associated with the 8,000 accounts and some cash representing deferred revenue relating to the 8,000 accounts. But the APA excluded many of Vision's other assets. For example, Vision maintained 2,000 other customer accounts that it continued to service (it also sold approximately 12,000 accounts to another company during 2014 and early 2015), as well as contracts with third parties for alarm system monitoring and cellular monitoring. Also excluded were Vision's bank accounts, cash, accounts receivable, intellectual property, insurance policies and related claims or causes of action, and certain office equipment. Vision has never dissolved and continues to exist as a Utah limited liability company in good standing. Vision still maintains a customer base of 1,500 customers, generates substantial monthly revenue, and otherwise continues to operate as a profitable enterprise.

In sum, there is evidence that would support a rational trier of fact to conclude that there was no continuation of Vision's enterprise at NorthStar after the APA transaction. Although many of Vision's employees and managers ended up working at NorthStar, many of them did

---

[4] "Acquired Business" is defined in the APA to be "the goodwill of the Business, including the goodwill related to the Customer Accounts," as well as the "furniture, fixtures and equipment used by or in connection with the Business that relates to the Customer Accounts."

not. And although NorthStar assumed the leases and office spaces in Orem, Utah, and Tempe, Arizona, Vision still leased and operated out of an office in Pleasant Grove, Utah. Further, it is unclear from the record whether there was a continuity of assets and operations in light of the accounts and contracts that remained with Vision and its continued operations after the APA transaction. Accordingly, there is a genuine dispute of fact material to the continuity factor.

B. **Continuity of shareholders**

The second factor looks at whether there is a continuity of shareholders. *Ekotek*, 948 F. Supp. at 1002. This factor, although not dispositive, is an important factor in light of the de facto merger doctrine's roots in equity. *See DeJesus*, 898 F. Supp. 2d at 362–63 ("The successor liability doctrine is an equitable doctrine, and the Court considers whether the shareholders used a disguised mechanism to transfer the legal ownership of the corporation but ultimately retain the same effective control."). Thus, "the question is whether [the seller's] shareholders or parent company sought to remain in control of its business through a merger while avoiding any continued liability." *Id.* at 363.

Here, the APA provided that NorthStar would acquire certain Vision assets in exchange for a cash payment and a minority ownership interest in NorthStar's holding company. The ownership interest in NorthStar's holding company was split with percentages allocated to a trust associated with Rob Harris and a trust associated with Dan Noble. Both Mr. Harris and Mr. Noble remain the principal owners of Vision.

Where the APA was consummated through both a cash payment and a conveyance of a minority ownership interest in NorthStar, a rational fact finder could conclude that Vision's shareholders were not seeking to remain in control of its business because they took a minority

ownership interest in NorthStar. Accordingly, there is a genuine dispute of fact over the degree to which there was a continuity of ownership after the APA transaction.

### C. The seller ceases operations, liquidates, and dissolves as soon as legally and practically possible

It is undisputed that Vision has not ceased its operations, liquidated, or dissolved. But Vivint maintains that this factor is satisfied when the seller shuts down its "ordinary business operations." *See Tabor*, 168 P.3d at 817 (stating the factors considered in analyzing the "continuity of enterprise" exception to the successor liability rule in the products liability context but ultimately rejecting that exception); *Okla. ex rel. Doak v. Acrisure Bus. Outsourcing Servs., LLC*, 529 F. App's 886, 894 (10th Cir. 2013) (applying the de facto merger doctrine under Michigan law); *Bud Antle, Inc. v. E. Foods, Inc.*, 758 F.2d 1451, 1458 (11th Cir. 1985) (holding that the dissolution factor is satisfied if "[t]he seller corporation ceases its ordinary business operations"). Vivint argues that prior to the APA transaction, Vision was in the business of selling and installing residential customer security alarm systems. After the APA transaction, Vision ceased selling and installing those systems and continues to exist only to service the remaining 2,000 accounts that were not sold to NorthStar. Vivint points to the fact that the APA also included an agreement that Vision would stop competing with NorthStar in for 5 years.

NorthStar responds by pointing to Vision's continued operations after the APA transaction and arguing that servicing and selling customer accounts has long been a regular aspect of its business. It specifically points to the fact that Vision continues to perform its obligations under the Settlement Agreement by participating in expedited arbitration proceedings with Vivint and by making settlement payments to Vivint. NorthStar also argues that because the non-compete provision of the APA only applies for five years and only prevents Vision from

11

competing in the states where NorthStar does business, Vision could conceivably continue selling residential alarms in more than half of the country.[5]

The facts before the court reveal a genuine dispute over what Vision's "ordinary business operations" were before the APA transaction and whether Vision ceased those ordinary business operations. Such a dispute can only be resolved by a trier of fact.

### D. The purchaser assumes the obligations of the seller necessary for uninterrupted continuation of business operations

The final factor examines the acquiring company's assumption of obligations necessary for it to continue the seller's business operations. Vivint points out that NorthStar agreed to assume a number of Vision's office leases, service agreements, and equipment leases. Vivint maintains that these contracts and obligations allowed for the uninterrupted continuation of Vision's ordinary business operations at NorthStar. But NorthStar focuses instead on the contracts and liabilities that it did not assume under the APA, including a number related to the continued servicing of the 2,000 customer accounts that Vision retained. NorthStar also points out that it did not assume all of Vision's obligations to its former employees and sales representatives, nor did it assume any of Vision's intellectual property. In sum, NorthStar argues that it assumed only certain obligations related specifically to the accounts that Vision sold to NorthStar; it did not assume all of Vision's obligations that were necessary to continue Vision's business operations.

Again, there is a dispute over what Vision's ordinary business operations were and whether the obligations that NorthStar assumed would allow for the uninterrupted continuation of those ordinary business operations by NorthStar.

---

[5] NorthStar does, or is qualified to do, business in 24 states.

## CONCLUSION

On the record before it, the court concludes that a rational trier of fact could find in favor of the nonmoving parties on each of the factors to be considered. Accordingly, summary judgment is inappropriate and Vivint's Motion [Dkt. No. 70] is **DENIED**.

IT IS SO ORDERED.

Signed August 14, 2017.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge